UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DENNIS T. NELSON,

                                        Plaintiff,

        v.                                                      9:18-CV-0657
                                                               (LEK/CFH)

JENKINS, et al.,[1]

                                        Defendant.

_____

APPEARANCES:

DENNIS T. NELSON
94-B-0694
Mohawk Correctional Facility
P.O. Box 8451
Rome, New York 13440
Plaintiff, pro se

LETITIA JAMES                           KEITH J. STARLIN, ESQ.
Attorney General for the                Assistant Attorney General
State of New York
The Capitol
Albany, New York 12224
Attorney for Defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[2]

        Plaintiff pro se Dennis T. Nelson ("Nelson" or "Plaintiff"), an inmate who was, at all

_____

[1] Following initial review of plaintiff's Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B), Senior District Court Judge Lawrence E. Kahn dismissed Jenkins, Hart, and Gorden as defendants in this action and dismissed without prejudice all of plaintiff's claims except his Eighth Amendment excessive force claim asserted against Disorbo. See Dkt. No. 5 at 17. Plaintiff did not file an amended pleading. Consequently, as Disorbo is the only remaining defendant, the Clerk of the Court is respectfully directed to amend the caption accordingly.

[2] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 against Defendant Correction Officer D.P. Disorbo ("Disorbo" or "Defendant") for violations of his Eighth Amendment rights.  See Dkt. No. 1 ("Compl.").  Presently before the Court is Defendant's motion for summary judgment.  See Dkt. No. 34.  Nelson opposed the motion (see Dkt. No. 39) and Defendant filed a reply (See Dkt. No. 40).  For the following reasons, it is recommended that Defendant's motion for summary judgment be granted.

## I.  BACKGROUND

### A.  FACTS[3]

The facts are reviewed in the light most favorable to Nelson as the non-moving party. See subsection II.A.1 infra.  At the time of the incidents described in the Complaint, Nelson was confined at Great Meadow Correctional Facility ("Great Meadow C.F.").  See generally, Compl.

The record herein contains few undisputed facts.  On October 3, 2017, Nelson was transferred from the Behavioral Health Unit ("BHU") to the infirmary in preparation for a medical trip to Coxsackie Correctional Facility ("Coxsackie C.F.").  See Dkt. No. 34-17 at 16,

_____

[3]  The parties provided exhibits with their submissions, without objection or challenges to the authenticity of any documents.  Therefore, to the extent that the "facts" asserted by the parties are supported by the record, the undersigned will consider the facts and relevant exhibits/documents in the context of the within motion.  See Daniel v. Unum Provident Corp., 261 F. App'x 316, 319 (2d Cir. 2008) ("[A] party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party).  In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the non-moving party. See Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003).

32.[4]  Nelson claims that, between 11:30 p.m. on October 3, 2017, and 12:00 a.m. on October 4, 2017, Disorbo, a correction officer in the BHU, entered her hospital room and raped her.[5] See generally Dkt. No. 34-17; Dkt. No. 34-18.  Disorbo disputes this claim and alleges that he did not assault Nelson and that he was not present at the facility from October 2, 2017, through October 4, 2017.  See Dkt. No. 34-34 at ¶¶ 5-9.

In August 2018, DOCCS' Central Office and Sexual Abuse Prevention & Education Office received two complaints from Nelson.  In the letters, Nelson claimed that she had been raped by Disorbo in October 2017.  See Dkt. No. 34-4 at ¶¶ 9-10; Dkt. No. 34-7 at ¶¶ 5-6; Dkt. No. 34-25 at ¶¶ 5-6.  In September 2018, the Great Meadow C.F. Prison Rape Elimination Act ("PREA") Office received a letter from Nelson, dated August 26, 2017, claiming that Disorbo raped her on October 3, 2017.  See Dkt. No. 34-27 at ¶ 11; Dkt. No. 34-29.

## B.  Procedural History

On June 5, 2018, the Court received the Complaint in the within action.[6]  See Compl. On July 5, 2018, the Court directed Disorbo to respond to the Eighth Amendment claims. See Dkt. No. 5 at 17.  Defendant filed an Answer to the Complaint.  See Dkt. No. 10.  On

---

[4]  Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

[5]  Nelson identifies as "a transgender female."  Compl. at 5.  Therefore, for the limited purposes of this Decision and Order, the Court will refer to her using female pronouns.

[6]  On May 23, 2018, Plaintiff executed the Complaint.  See Compl. at 5.

June 18, 2019, Nelson appeared at a deposition.[7]  See Dkt. No. 34-17.  On August 8, 2019,

Nelson appeared for a second deposition.  See Dkt. No. 34-18.  On December 20, 2019,

Defendant filed the within motion pursuant to Rule 56 of the Federal Rules of Civil Procedure

seeking judgment as a matter of law with respect to Nelson's claims.  See Dkt. No. 34.


## II.  DISCUSSION

Nelson contends that Defendant violated her Eighth Amendment rights.  See generally

Compl.  Defendant moves for summary judgment arguing that Nelson failed to exhaust her

administrative remedies.[8]  See Dkt. No. 34-37 at 10-14.  Alternatively, Defendant contends

that he was not personally involved in any Eighth Amendment violations.  See id. 14-19.


### A. Legal Standards

### 1. Motion for Summary Judgment

Summary judgment may be granted only if the submissions of the parties taken

together "show[] that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); see Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 251-52 (1986).  "The party moving for summary judgment bears

the initial burden of showing, through the production of admissible evidence, that no genuine

issue of material fact exists."  Price v. Oropallo, No. 9:13-CV-0563 (GTS/TWD), 2014 WL

---

[7]  The deposition was not completed because Nelson abruptly refused to answer questions and left the room.  See Dkt. No. 34-17 at 50.

[8]  In the Answer, Defendant pleaded, among other things, the affirmative defense that Nelson failed to exhaust her administrative remedies.  See Dkt. No. 10 at 3 ¶ 15.

4

4146276, at *4 (N.D.N.Y. Aug. 19, 2014) (citing Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006)).  Facts are material if they may affect the outcome of the case as determined by substantive law.  See Anderson, 477 U.S. at 248.  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party."  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir.1997).

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  See Salahuddin, 467 F.3d at 272-73.  The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a *pro se* litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest.  At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not consistent with the *pro se* litigant's allegations, or arguments that the submissions themselves do not suggest, that we should not excuse frivolous or vexatious filings by *pro se* litigants, and that *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law . . . .

5

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, . . . a court is obligated to construe his pleadings liberally.") (internal quotation marks and citations omitted).

### 2. N.D.N.Y. Local Rule 7.1(a)(3)

Local Rule 7.1(a)(3) requires a party moving for summary judgment to file and serve a Statement of Material Facts.  See N.D.N.Y. L.R. 7.1(a)(3).  "The Statement of Material Facts shall set forth, in numbered paragraphs, . . . each material fact about which the moving party contends there exists no genuine issue."  Id.  The opposing party is required to file a response to the Statement of Material facts "admitting and/or denying each of the movant's assertions . . ., in matching numbered paragraphs."  Id.  "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  Id. (emphasis omitted).

Defendant argues that because Nelson failed to submit any response to his Statement of Material Facts, the facts set forth in the Statement of Material Facts must be deemed admitted.  See Dkt. No. 40 at 3-4.  The undersigned is not required to "perform an independent review of the record to find proof of a factual dispute."  Prestopnik v. Whelan, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003).  Although Defendant argues, and the Local Rules provide, that the Court shall deem admitted any facts the nonmoving party fails to "specifically controvert," pro se plaintiffs are afforded special solicitude in this District and within the Second Circuit.  N.D.N.Y. L.R. 7.1(a)(3); see subsection II.A.1, supra.  Accordingly, in

deference to plaintiff's <u>pro se</u> status, the Court will independently review the record when evaluating defendants' motion for summary judgment, and "treat plaintiff's opposition as a response to" defendants' Statement of Material Facts.  <u>Johnson v. Lew</u>, No. 1:13-CV-1072 (GTS/CFH), 2017 WL 3822047, at *2 (N.D.N.Y. Aug. 30, 2017) ("Out of special solicitude to [the p]laintiff as a *pro se* civil rights litigant, however, the Court will treat his opposition as a response to [the d]efendant's Rule 7.1 Statement, carefully reviewing it for any record-supported disputation of [the d]efendant's Rule 7.1 Statement."); <u>see</u> <u>Perry v. Ogdensburg Corr. Facility</u>, No. 9:10-CV-1033 (LEK/TWD), 2016 WL 3004658, at *1 (N.D.N.Y. May 24, 2016) (determining that "although [the p]laintiff failed to respond to the statement of material facts filed by [the d]efendants as required under Local Rule 7.1(a)(3), the Court would invoke its discretion to review the entire record when evaluating the parties' respective [m]otions for summary judgment.").

### B.  Exhaustion

Defendant argues that the motion for summary judgment must be granted because Nelson failed to exhaust her administrative remedies.  <u>See</u> Dkt. No. 34-37 at 10-14; Dkt. No. 40 at 4-8.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration.  <u>See</u> 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").  The exhaustion requirement applies "'to all inmate suits about prison life,

whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'" Cucchiara v. Dumont, No. 9:18-CV-0182 (GLS/CFH), 2019 WL 2516605, at *4 (N.D.N.Y. Apr. 26, 2019) (quoting Porter v. Nussle, 534 U.S. 516, 532 (2002)).  Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages.  See Porter, 534 U.S. at 524.  "To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated."  Cuadrado v. Brueault, No. 9:14-CV-1293 (DNH/CFH), 2015 WL 1606178, at *3 (N.D.N.Y. Apr. 8, 2015); see Jones v. Bock, 549 U.S. 199, 218 (2007).

Here, the parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program.  See N.Y. COMP. CODES R. & REGS. (7 N.Y.C.R.R.) § 701.5.  First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within 21 calendar days of the alleged incident.  See id. at § 701.5(a)(1).  An IGP representative has 16 calendar days to informally resolve the issue.  See id. at § 701.5(b)(1). If no informal resolution occurs, the Inmate Grievance Review Committee ("IGRC") must hold a hearing within 16 calendar days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing.  See id. at § 701.5(b)(2)(i)-(ii).  If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination.  See id. at § 701.5(c)(1).  If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination.  See id. at § 701.5(d)(i).  CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons

8

stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within

thirty (30) calendar days from the time the appeal was received." Id. at § 701.5(d)(3)(ii).

In cases such as the one at hand, involving complaints regarding sexual abuse or

harassment, DOCCS set forth a different procedure.  7 N.Y.C.R.R. 701.3(i)[9] provides that "an

inmate is not required to file a grievance concerning an alleged incident of sexual abuse or

sexual harassment to satisfy [PLRA] exhaustion requirement . . . before bringing a lawsuit

regarding an allegation of sexual abuse as long as the matter was reported[.]"  7 N.Y.C.R.R.

§ 701.3(i).[10]  Further, Section 701.3(i) states:

> For purposes of [PREA] Standards and the exhaustion
> requirement, any allegation concerning an incident of
> sexual abuse or sexual harassment (28 C.F.R §
> 115.52) shall be deemed exhausted if official
> documentation confirms that:
>
> (1) an inmate who alleges being the victim of sexual
> abuse or sexual harassment reported the incident to
> facility staff; in writing to Central Office Staff; to any
> outside agency that the Department has identified as
> having agreed to receive and immediately forward
> inmate reports of sexual abuse and sexual
> harassment to agency officials under the PREA
> Standards (28 C.F.R § 115.52(b)); or to the
> Department's Office of the Inspector General; or
>
> (2) a third party reported that an inmate is the victim of
> sexual abuse and the alleged victim confirmed the
> allegation upon investigation.

Id. Further, "[a] sexual abuse or sexual harassment complaint may be submitted at any time

. . . ." Id. "If an inmate does file a grievance regarding a complaint of sexual abuse or sexual

---

[9]  7 N.Y.C.R.R. § 701 is contained in DOCCS directive No. 4040.

[10]  The case law interpreting Section 701.3(i) is limited.  See Sheffer v. Fleury, No. 9:18-CV-1180 (LEK/DJS), 2019 WL 4463672, at *6, n. 5 (N.D.N.Y. Sept. 18, 2019) (collecting cases).

harassment, '[t]he complaint shall be deemed exhausted upon filing.'"  Sheffer v. Fleury, No. 9:18- CV-1180 (LEK/DJS), 2019 WL 4463672, at *4 (N.D.N.Y. Sept. 18, 2019) (quoting 7 N.Y.C.R.R. § 701.3(i)).

Nelson does not dispute that a grievance process existed at Great Meadow C.F. and that she was aware of "701 and [DOCCS Directive No.] 4040."  Dkt. No. 34-18 at 36-37.

### 1.  Did Plaintiff Exhaust Her Administrative Remedies?

It is well-settled that "the PLRA requires that an inmate plaintiff must exhaust his available administrative remedies before commencing a lawsuit in federal court with respect to prison conditions."  Peoples v. Beldock, 212 F. Supp.2d 141, 142 (W.D.N.Y. 2002); see McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at *2 (N.D.N.Y. Dec. 18, 2017) ("The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action.") (citation omitted).

Because Nelson's allegations involve sexual abuse, she was not required to file a grievance or follow DOCCS' three step process in order to satisfy the PLRA's exhaustion requirement.  See Medina v. Kaplan, No. 16-CV-7223, 2018 WL 797330, at *5 (S.D.N.Y. Feb. 8, 2018) ("[T]o the extent that [the p]laintiff claims she was sexually abused or harassed during the course of the alleged incident, she is 'not required to file a grievance . . . to satisfy the . . .[PLRA].'" (quoting 7 § N.Y.C.R.R. 701.3(i))).  Defendant does not disagree, but argues that Nelson did not comply with the requirements of Section 701.3(i) and thus, did not satisfy the exhaustion requirement because she did not make any complaint alleging sexual assault until after she commenced this lawsuit.  See Dkt. No. 34-37 at 11.  In this regard, Defendant

asserts that (1) Nelson did not file a PREA complaint until August 2018; (2) Nelson did not complain about the incident through the grievance process; and (3) Nelson failed to report the alleged sexual abuse to a staff member.  See Dkt. No. 34-37 at 10-14.

### a.  PREA complaint

In support of the motion, Defendant provided the Declaration of Nancy Steuhl ("Steuhl"), DOCCS' general counsel, see Dkt. No. 34-25; and Jason D. Effman ("Effman"), DOCCS Associate Commissioner for PREA Compliance.  See Dkt. No. 34-7.  Steuhl and Effman aver that DOCCS' Sexual Abuse Prevention & Education Office received two letters from Nelson on August 22, 2018, and August 29, 2018, dated August 12, 2018, and August 24, 2018, respectively, in which Nelson referenced the October 3, 2017 incident.  See Dkt. No. 34-25 at ¶¶ 5, 6; Dkt. No. 34-7 at ¶ 5; Dkt. No. 34-5; Dkt. No. 34-6.  Defendant also provided a Declaration from Aaron Torres ("Torres"), the Assistant Deputy Superintendent for PREA at Great Meadow C.F., who averred that Great Meadow C.F. received a letter from Nelson on September 4, 2018, dated August 26, 2018, alleging that Disorbo raped her on October 3, 2017.  See Dkt. No. 34-27 at ¶¶ 1, 11.

Conversely, Nelson testified that she mailed a PREA complaint to a woman "with an organization that deals with rape cases in prison" on October 5, 2017 and received a "handwritten letter" in response to her complaint.  Dkt. No. 34-18 at 29, 72; see id. at 25-31, 72-73, 94-95.  Nelson did not proffer a copy of that complaint, the name of the person to whom she mailed the complaint, the response, the date of the response, or the name of the individual who issued the response.  See id. at 25-31, 72-73, 94-95.  Nelson also stated that, in November 2017, Torres interviewed her regarding her PREA complaint.  See id. at 76-78.

Torres disputes this claim and states that Great Meadow C.F. first became aware of Nelson's rape allegations on September 4, 2018.  See Dkt. No. 34-27 at ¶ 14.

Upon review, the undersigned concludes that Nelson's unsubstantiated and unsupported claim that she filed a PREA complaint in October 2017, and spoke to Torres shortly thereafter, is insufficient to overcome the evidence submitted by Defendant and does not constitute proper exhaustion pursuant to Section 701.3(i).

### b. Grievances

It is undisputed that, on November 8, 2017, Nelson filed a grievance (GM 62685-17) accusing Disorbo, and other officers, of harassment and tampering with her mail.  See Dkt. No. 34-18 at 99-100; Dkt. No. 34-13 at 2.  The November 2017 grievance (GM 62685-17) was identified as an exhibit during Nelson's August 2019 deposition, see Dkt. No. 34-18 at 97-102, but is not part of the record herein.  Nevertheless, Nelson concedes that the grievance does not reference the October 2017 incident or include accusations of rape.  See Dkt. No. 34-18 at 99-102.

It is further undisputed that Nelson filed two grievances in March 2018, which are part of the record before the Court.  On March 15, 2018, Nelson filed a grievance (GM 63001-18) claiming that she was "sexual [sic] harassed by every body on [her] gallary [sic]."  Dkt. No. 34-14 at 4.  On March 22, 2018, Nelson filed a second grievance (GM 63018-18) and complained that Disorbo harassed her "about [her] bra" and claimed that officers "play to[o] many homo games with [her]."  Dkt. No. 34-15 at 2, 3; see Dkt No. 34-12 at ¶ 20.  The Court has reviewed these grievances and notes that the complaints lack any reference to the October 2017 incident or accusations of rape.

12

However, Nelson testified that, on October 9, 2017, she mailed a grievance alleging that she was raped by Disorbo.  See Dkt. No. 34-18 at 38.  She further testified that the Grievance Officer informed her in person on October 12, 2017, that he did not receive a grievance from Nelson, so she filed a second grievance that same day.  See id. at 49-50.  Nelson claims that she received a decision from the IGRC within seven days of filing her second grievance, and that she appealed the decision to the Superintendent the same day she received the decision.  See id. at 55-56.  Nelson testified that, within two or three days, the Superintendent granted her grievance and that she appealed the determination to CORC.  See id. at 58-59.  Nelson asserts that CORC issued a decision sometime around October 27, 2017.  See id. at 34-18 at 61.  Nelson has not proffered copies of the October 2017 grievances, the IGRC response, her appeal to the Superintendent, the Superintendent's response, her appeal to CORC, or CORC's response.  During her deposition, Nelson testified that she had a copy of her appeal to CORC and CORC's decision in her cell.  See id. at 64-67.  Nelson however, has not produced those documents and, in opposition to the within motion, only submitted copies of grievances filed in March 2018 and DOCCS' response to those grievances.  See Dkt. No. 39-1 at 43, 44, 45, 48.

In support of the motion for summary judgment, Defendant provided the Declaration of Alexandria Mead ("Mead"), the Inmate Grievance Program ("IGP") Supervisor for Great Meadow C.F.  See Dkt. No. 34-12.  Mead reviewed Great Meadow C.F. records and found no grievances filed by Nelson with allegations of rape.  See id. at ¶¶ 15, 22.  Defendant also provided the Declaration of Rachael Seguin ("Seguin"), the Assistant Director of the Inmate Grievance Program for DOCCS.  See Dkt. No. 34-36.  Seguin reviewed CORC records for determinations upon grievance appeals brought by Nelson and found none for grievances

13

with respect to the October 2017 incident.  See id. at ¶ 9.

Based upon the record before the Court, the undersigned finds that Nelson's conclusory and unsupported claim that she filed grievances in October 2017 is insufficient to defeat the evidence submitted by Defendant and does not constitute proper exhaustion pursuant to Section 701.3(i).

### c. Reports to Facility Staff

Affording Nelson special solicitude as a pro se plaintiff and construing the Complaint to raise the strongest arguments it suggests, Nelson claims that she exhausted her administrative remedies because she reported the abuse to various staff members at Great Meadow C.F. prior to August 2018.

Defendant claims that Nelson's first verbal complaint regarding the October 2017 incident was lodged in August 2018 during an interview with an unidentified investigator from the Office of Special Investigation ("OSI").  See Dkt. No. 34-1 at ¶¶ 10, 20.  Nelson does not dispute that the conversation occurred but maintains that she verbally reported the incident to several staff members before that date.  See Dkt. No. 34-18 at 125-30.

Nelson testified that, on October 5, 2017, at approximately 7:30 p.m. or 8:00 p.m., she reported the rape to Sergeant William Granger ("Granger") and that Granger told her to file a PREA complaint and to write to Deputy Superintendent Melissa Collins ("Collins").  See Dkt. No. 34-18 at 30-33.  Nelson further stated that, on October 8, 2017, at approximately 1:00 p.m., she told Collins that Disorbo raped her and that Collins told her to file a PREA complaint and a grievance.  See id. at 33-35.  Moreover, as discussed supra, Nelson testified that Torres interviewed her in November 2017.  See id. at 76-79.  Nelson also claims that she

14

spoke to Collins in June 2018 and told her that she intended to file a lawsuit and that Collins

responded, "that's a good idea." Id. at 89-90.  In support of the motion, Granger and Collins

provided declarations stating that Nelson never reported any instance of sexual abuse.  See

Dkt. No. 34-33 at ¶ 6; Dkt. No. 34-35 at ¶ 6.  Moreover, Torres provided a declaration and

avers that he did not become aware of Nelson's allegations until September 4, 2018.  See

Dkt. No. 34-27 at ¶ 14.

However, in addition to the aforementioned complaints, Nelson claims that she

reported the incident to various medical professionals.  To wit, Nelson testified that, on the

morning of October 4, 2017, she told Nurse Havens, a nurse in the Great Meadow C.F.

infirmary, that Disorbo raped her.  See Dkt. No. 34-18 at 125-26.  Nelson claims that Nurse

Havens responded, "take it up with PREA" and "take a shower."  Id. at 127.  Nelson also

asserts that, later the same day, she underwent a physical at the infirmary and reported the

rape to Dr. Karandy, the doctor "in charge of Medical."  Id. at 132.  Nelson further testified

that, on October 5, 2017, she filed a sick call slip and "actually sa[id] [she] had been raped"

by Disorbo on the slip.  Id. at 34-18 at 128.  Nelson alleges that she handed the slip to a BHU

nurse, but did not receive a response to that request.  See id. at 130.  Defendant does not

address these allegations and the record before the Court does not contain an affidavit or

declaration from Nurse Havens, Dr. Karandy, or Nelson's medical records.

Because Nelson claims that she reported the incident to medical professionals,

underwent a physical examination, and filed a sick call request, it is possible that official

documentation exists confirming her allegations.  See Abreu v. Miller, No. 9:15-CV-1306

(TJM/DJS), 2018 WL 5660409, at *5 (N.D.N.Y. Aug. 16, 2018) (reasoning that sick call slips

could serve as documentation confirming that the plaintiff reported the sexual assault

sufficient to satisfy the requirements of section 701.3(i)); see also Allen v. Graham, No. 9:16-CV-47 (GTS/ATB), 2017 WL 9511168, at *7 (N.D.N.Y. Sept. 26, 2017) (concluding that health treatment notes may constitute "official documentation" confirming that the plaintiff reported the sexual assault to facility staff, "raising an additional question of fact with regard to exhaustion" (internal quotation marks omitted)).

Accordingly, the Court cannot conclude that Defendant met his burden of establishing that Nelson did not exhaust her administrative remedies.  See Abreu, 20018 WL 5660409, at *5 (reasoning that the defendants did not address whether "official documentation" existed and thus, failed to meet the burden of establishing that the plaintiff failed to exhaust).[11] However, for the reasons that follow, it is recommended that Defendant's motion be granted based on lack of personal involvement.

### C.  Personal Involvement

Defendant argues that he was not personally involved in any constitutional violation because he was not present in the Great Meadow C.F. infirmary on October 2, 2017, October 3, 2017, and October 4, 2017.  See Dkt. No. 34-37 at 14-19.  "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.'"  Austin v.

---

[11]  As the undersigned concludes that Defendant did not meet his burden of establishing that Nelson failed to exhaust her administrative remedies, the undersigned declines to reach Defendant's arguments regarding the unavailability of administrative remedies.  See Dkt. No. 40 at 5-6.

Pappas, No. 04-CV-7263 (KMK/LMS), 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)).

In her Complaint and during her depositions, Nelson clearly identified Disorbo as the assailant.  In support of the motion, Disorbo submitted a sworn declaration in which he states that he was not working at Great Meadow C.F. on October 2, 2017, October 3, 2017, and October 4, 2017.  See Dkt. No. 34-34 at ¶¶ 5-9.  Defendant also provided sworn statements from non-party witness' and documentary evidence supporting his claim.

Darin Williams ("Williams"), a lieutenant in the timekeeping office at Great Meadow C.F., provided a Declaration in which he avers that payroll and timekeeping records for the pay period of September 28, 2017, through October 11, 2017, reveal that Disorbo was absent from work on October 2, 2017, and had "regular days off" on October 3, 2017, and October 4, 2017.  See Dkt. No. 34-30 at ¶¶ 1, 5, 6.  Accordingly, Williams concludes that Disorbo was not present for work at Great Meadow on those days.  See id. at ¶ 9.  A copy of Disorbo's timesheet for the pay period of September 28, 2017, through October 11, 2017, was annexed as an exhibit to the motion.  See Dkt. No. 34-11.

Defendant also provided Declarations from Correction Officers Garrett Atty ("Atty") and Michael Macura ("Macura").  See Dkt. Nos. 34-2 and 34-10.  Atty avers that he was working in the infirmary from 3:45 p.m. on October 3, 2017, until midnight on October 4, 2017, and Macura avers that he was on duty in the infirmary on October 4, 2017, between 12:00 a.m. and 8:00 a.m.  See Dkt. No. 34-2 at ¶ 5; Dkt. No. 34-10 at ¶ 5.  Atty and Macura reviewed the Great Meadow C.F. infirmary logbook for the relevant time period.  See Dkt. No. 34-2 at ¶ 7; Dkt. No. 34-10 at ¶ 7.  The logbook is a record that officers are required to maintain throughout their shift to document rounds, personnel, and unusual incidents.  See Dkt. No.

17

34-2 at ¶ 6; Dkt. No. 34-10 at ¶ 6.  Atty and Macura aver that they did not see Disorbo in the infirmary, they do not recall any disturbance during their shifts, and they note that Disorbo's name is not listed on the infirmary logbooks for the relevant time period.  See Dkt. No. 34-2 at ¶¶ 7-9; Dkt. No. 34-10 at ¶¶ 7-10.  A copy of the Great Meadow C.F. infirmary logbook for October 3, 2017, and October 4, 2017, was annexed to the motion.  See Dkt. No. 34-3 at 1-2.

Generally, credibility issues are questions of fact for resolution by a jury and are inappropriately decided by a court on motion for summary judgment.  See Rule v. Brine, Inc. 85 F.3d 1002, 1011 (2d Cir. 1996).  However, in Jeffreys v. City of New York, the Second Circuit held that the plaintiff's uncorroborated version of events was so improbable that "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in [the] complaint."  426 F.3d 549, 555 (2d Cir. 2005) (internal quotation marks and citation omitted).  On a balancing of factors, "[t]he Jeffreys exception applies when 1) the plaintiff relies almost exclusively on his own testimony; 2) the plaintiff's testimony is contradictory or incomplete; and 3) the plaintiff's testimony is contradicted by the evidence produced by the defense."  Morris v. Plummer, No. 9:09-CV-0734 (NAM/DEP), 2011 WL 1135936, at *9 (N.D.N.Y. Mar. 2, 2011) (internal quotation marks and citation omitted).  The exception applies "where the sole basis for the disputed issues of fact are statements by the plaintiff, which are so lacking in credibility that no reasonable juror could find for the plaintiff." Blake v. Race, 487 F. Supp. 2d 187, 202 (E.D.N.Y. 2007).

The first factor, which looks to whether the plaintiff has substantiated her claims only by her own testimony, is met here because Nelson relies solely on her Complaint and deposition testimony.  The record lacks any competent, admissible evidence supporting Nelson's claim that she was raped.

18

With regard to the second factor, Nelson's allegations and recitation of factual events are riddled with inconsistencies such that no reasonable juror could believe her.  The first notable contradiction relates to when the incident occurred.  During her first deposition, Nelson testified that the incident occurred at midnight.  See Dkt. No. 34-17 at 17.  As the deposition continued, Nelson repeatedly changed her story.  Upon further inquiry, she testified that the rape occurred about an hour or two before midnight.  See id. at 18.  When questioned further, she testified that it occurred between 11:30 p.m. and midnight and explained that she was certain of the time because she asked the officer that was standing outside the door to her hospital room.  See id. at 19.  Again, as the questioning continued, she recanted and testified that she did not ask the unidentified officer but, rather, she asked Disorbo to tell her the time.  See id. at 20-22.  When counsel asked her to elaborate, she testified:

> A. I asked him what time it was.
> Q. You asked Disorbo what time it was?
> A. Yes.
> Q. Okay.  Earlier you seemed to say that you asked another officer - -
> A. No.
> Q. - - who was standing by the - -
> A. No.
> Q. - - door what time it was.
> A. No.
> Q. No.  So as Officer Disorbo was raping you, you asked him what time it was?
> A. Yes.
> Q. And was that in the middle of the alleged rape?
> A. Yes.
> Q. And what did Officer Disorbo say in return?
> A. What?
> Q. When you asked him what time it was, what did he say in return?
> A. To buy a watch.

19

Id. at 34-17 at 20-21.  In a further attempt to clarify what time the incident occurred, counsel continued with the line of questioning.  When Nelson was asked how she knew that the incident occurred between 11:30 p.m. and midnight, Nelson stated, "I just knew the time."  Id. at 23.  In response to counsel's final attempt to obtain clarity on this issue, Nelson changed her version of events again and stated, "I saw a clock on the wall in front of the nurses' station."  Id. at 24.  Nelson also provided conflicting testimony regarding the duration of the attack.  Initially, she stated that it lasted "an hour or two" and then, upon further questioning, she claimed it lasted for fifteen to twenty minutes.  Id. at 42.  During the second deposition, Nelson changed her account and testified that she was assaulted for five to ten minutes.  See Dkt. No 34-18 at 23.

Nelson's testimony regarding her prior interactions with Disorbo is equally incompatible.  During the first deposition, Nelson testified that she had never met Disorbo, had no "run-ins" with him, and "had no contact whatsoever" with Disorbo before he entered her hospital room at 11:30 p.m. on October 3, 2017.  Dkt. No. 84-17 at 30.  In an effort to understand her testimony, counsel repeated the question, and Nelson answered in the same manner.  See id. at 31.  During her second deposition, Nelson altered her story and testified that she met Disorbo before the incident.  See Dkt. No. 34-18 at 15. Nelson stated that, on the morning of the alleged assault, Disorbo stood in front of her BHU cell with mail and "rip[ped] it up and thr[ew] it in [her] cell."  Id. at 18.  At approximately 1:00 pm. on the same day, Disorbo escorted Nelson from the BHU to the infirmary and threatened her, telling her "I'll be back at midnight."[12]  Id. at 17.

---

[12]  During the first deposition, Nelson claimed that she was admitted to the infirmary at 9:00 a.m. on October 3, 2017.  See Dkt. No. 34-17 at 32.

Later in the deposition, Nelson amended her story again.  Nelson testified that Disorbo

began working in the BHU in 2016 and that she overheard Disorbo tell other inmates that he

identified as transgender, that he "liked" to rape and harass inmates, and that he enjoyed

playing with their mail.  Dkt. No. 34-18 at 106; see id. at 107, 113.  When Nelson was asked

about the contrast between this recent account of her interactions with Disorbo and her prior

testimony, Nelson provided evasive responses:

> A.   I never knew him.
> Q.   But how could you have overheard him saying
>      that if you didn't see him?
> A.   I was on the same Company.
> Q.   Yeah, but - - right.  So how could you never have
>      seen him before?
> A.   Because - - .
> Q.   Wait, hold on.  Let me finish.  How could you
>      have never seen him before October 3rd of 2017
>      if he was working in the BHU Unit since 2016?
> A.   Yes.
> Q.   So how did - - ?
> A.   That's when he started.
> Q.   Yeah, so how - - how could you never have seen
>      him before October 3rd of 2017, then?
> A.   I can't answer that.
> Q.   You can't answer that?  Okay and how is it that
>      you overheard him telling other inmates he was
>      transgender in 2016 if you never saw him before
>      October 3rd of 2017?
> A.   I can't answer that.
> Q.   You can't answer that?  I can't hear you.  No?
> A.   I can't answer that.

Id. at 110-11.

Counsel continued with the line of questioning, and Nelson altered her version of

events:

> Q.   Well earlier you had said you'd never seen him
>      before October 3rd of 2017, but then later you
>      said you heard him saying all these things in

> 2016.  So how could you have heard him if you didn't see him?
>
> A.    Some C.O.s walk around, some C.O.s don't. []
>
> Q.    Okay.  Did you actually see him in 2016 when you heard Officer Disorbo saying those thing you described for us?
>
> A.    Yes.
>
> Q.    You saw him in 2016?
>
> A.    Yes.  Only one time.

Dkt. No. 34-18 at 114-15.

Nelson's testimony regarding her subsequent interactions with Disorbo is also inconsistent.  During her first deposition, Nelson testified:

> Q.    Have you had any contact at all with Officer Disorbo since this alleged incident occurred?
>
> A.    No.
>
> Q.    Okay.  You've never seen him again?
>
> A.    No.
>
> Q.    And have you ever spoken to him again or had any communications at all, written, spoken, anything with him again - -
>
> A.    No.
>
> Q.    - - since he left your room after this incident occurred on October 3, 2017?
>
> A.    No.

Dkt. No. 34-17 at 41-42.   However, the record also includes testimony and evidence establishing that Nelson filed grievances against Disorbo in November 2017 and March 2018 accusing him of "harassment."  Dkt. No. 34-18 at 97-100; Dkt. No. 39-1 at 43.  Additionally, in her August 2018 PREA complaints, Nelson reported that, "[i]t took so long to write you because [Disorbo] also was tampering with my outcoming [sic] mail and incoming" and that Disorbo "had [] other CO [sic] beat [her] up."  Dkt. No. 34-5; see Dkt. No. 34-6; Dkt. No. 34-8 at 1.

Nelson also provided inconsistent testimony regarding other issues.  For example, she

initially testified that the door to her hospital room was closed during the alleged rape, then, upon further questioning, she adjusted her story and testified that it was open, and then again that it was closed.  See Dkt. No. 34-17 at 19, 25, 29.  Additionally, Nelson alleged that, sometime between October 2017 and early November 2017, she reported the rape to her social worker, Ms. Denman, who told her to keep it a "secret".  Dkt. No. 34-18 at 135.  Later, during the same deposition, however, she admitted that she did not "see" Ms. Denman prior to 2018.  Id. at 145.

The final Jeffreys factor also weighs in favor of applying the Jeffreys exception.  Here, as discussed above, Defendant presented declarations from non-party witnesses and competent, documentary evidence, including the logbook entries and payroll records, contradicting Nelson's conclusory and unsupported allegations of Disorbo's involvement.  See Dove v. City of New York, No. 03-CV-5052 (JFB/LB), 2007 WL 805786, at *5-6 (E.D.N.Y. Mar. 15, 2007) (finding support for the Jeffreys exception where there was no credible evidence demonstrating that the assault occurred).  Moreover, in her opposition to the motion for summary judgment, Nelson did not present any argument, evidence, or response to Disorbo's claim that he was not working at the facility on, or around, the day of the alleged incident.  See Quick v. Quinn, No. 9:12-CV-1529 (DNH/DEP), 2014 WL 4627106, at *5 (N.D.N.Y. Sept. 11, 2014) (finding support for Jeffreys exception where the plaintiff failed to respond to the defendant's claim that he was not working on the day of the incident).

Based upon the record before the Court, the undersigned concludes that no reasonable juror could credit Nelson's testimony and thus, the within action presents the rare circumstances in which the Jeffreys exception should apply.  See McClemore v. Bosco, No. 9:14-CV-0626 (BKS/DEP), 2018 WL 1193308, at *12 (N.D.N.Y. Feb. 2, 2018) (applying the

23

<u>Jeffreys</u> exception where the only record evidence that exists to support the plaintiff's allegation is his verified complaint and deposition testimony); <u>see</u> <u>also</u> <u>O'dell v. Bill</u>, No. 9:13-CV-1275 (FJS/TWD), 2015 WL 710544, at *29 (N.D.N.Y. Feb. 18, 2015) (applying the <u>Jeffreys</u> exception to award summary judgment even assuming the facts surrounding the incident because the plaintiff failed to produce competent evidence demonstrating that the defendants were liable).  Accordingly, the undersigned recommends that Defendant's motion for summary judgment be granted.

### III.  CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendant's motion for summary judgment (Dkt. No. 34) be **GRANTED**; and it is further

**RECOMMENDED**, that Plaintiff's Complaint (Dkt. No. 1) be **DISMISSED WITH PREJUDICE**, and it is further

**ORDERED**, that the Clerk of the Court amend the caption in accordance with footnote one of this Report-Recommendation & Order, and it is further,

**ORDERED**, that copies of this Report-Recommendation & Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN**

**FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  Roldan v. Racette, 984

F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15

(2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 6(a), 6(e), 72.[13]


      Dated: May 20, 2020
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[13]  If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Id. § 6(a)(1)(C).